WEIS–BUY SERVICES, INC. and Brigiotta's Produce & Garden Center, Plaintiffs,

v.

Ralph PAGLIA, Jr., in his individual capacity, and August J. Scolio, Jr., in his individual capacity, Defendants.

No. CIV. 00–121 ERIE.

United States District Court, W.D. Pennsylvania.

March 9, 2004.

Theodore B. Ely, Ely & Smith, Erie, PA, David A. Adelman, Keaton & Associates, Palatine, IL, for plaintiff.

Kenneth W. Wargo, Quinn, Buseck, Leemius, Toohey & Kroto, Inc., Erie, PA, for defendant.

### Opinion

COHILL, District Judge.

Plaintiffs Weis–Buy Services, Inc. ("Weis–Buy") and Brigiotta's Produce & Garden Center ("Brigiotta's") are seeking money owed for produce provided by Plaintiffs to United Fruit & Produce Company ("United Fruit"). Plaintiffs filed the instant Complaint on April 26, 2000 alleging breach of fiduciary duty against Defendant August J. Scolio, Jr., under the Perishable Agricultural Commodities Act of 1930, as amended, 7 U.S.C. §§ 499a–499t ("PACA").[1]

---

1. Plaintiffs brought the same claim against Defendant Ralph J. Paglia, Jr. Default judg-

The case was referred to arbitration on October 19, 2000. After arbitration proceedings were completed a trial *de novo* was sought in this court on December 19, 2001. The case was then assigned to this Judge on March 4, 2002.

A bench trial was held on March 19, 2003, at which both parties presented evidence and argument. Plaintiffs were represented by David A. Adelman, Esquire, and Theodore B. Ely, Esquire. Defendant was represented by Kenneth W. Wargo, Esquire. At the conclusion of the hearing, the parties were asked to submit proposed findings of fact and conclusions of law.

On April 17, 2003, Mr. Scolio filed his *Proposed Findings of Fact, Conclusions of Law, and Post–Trial Memorandum* (Doc. 31) ("*Scolio's Proposed Findings*"). On May 27, 2003, Plaintiffs filed their *Proposed Findings of Fact, Conclusions, and Memorandum of Law and Response to Defendant's Proposed Findings of Fact, Conclusions of Law* (Doc. 32) ("*Plaintiffs' Proposed Findings*"). Finally, on June 5, 2003, Mr. Scolio filed his *Response to Plaintiffs' Proposed Findings of Fact, Conclusions, and Memorandum of Law* (Doc. 33) (*Scolio's Response*").

There are three issues before the court: (1) Whether Plaintiffs' Claims are Barred by the Statute of Limitations (2) Whether Defendant Scolio is Liable for Breach of Fiduciary Duty under PACA (3) Whether an Award of Interest and Attorney's Fees are Included in the PACA Claims

## I. FACTS

At trial, testimony was provided by August J. Scolio, Jr., Jack Goldstein, a representative from Weis–Buy, Thomas N. Galbato, a representative from Brigiotta's, and Mary Louise Bell, a former employee of United Fruit.

The parties have stipulated to the following facts. (*See* Doc. 28, "Parties Stipulation of Facts," March 19, 2003; and Court Ex. 1.) Admission into evidence of both Weis–Buy's and Brigiotta's invoices as their respective business records. That each of the Plaintiffs have properly preserved their PACA trust rights against United Fruit, and are PACA trust beneficiaries. The United States Bankruptcy Court qualified each of the Plaintiffs' claims as valid PACA trust claims against United Fruit. The principal amount of Weis–Buy's invoices subject to PACA trust total $35,945.90. The principal amount of Brigiotta's invoices subject to PACA trust total $17,088.95. When United Fruit purchased the produce at issue, the Defendant was an officer of United Fruit.

In addition, the testimony and evidence show the following relevant facts.

### Plaintiffs' Invoices

Weis–Buy provided produce to United Fruit in shipments made between July 9, 1997 and September 23, 1997. The corresponding invoices for these shipments are invoice numbers 12749, 12963, 13134, 13228, and 13529. (Plaintiff's Ex. 1.) Brigiotta provided produce to United Fruit in shipments made between August 23, 1997 and February 22, 1998. The corresponding invoices for these shipments are invoice numbers 111454, 114457, 119410, 119582, 120204, 120997, 124218, 124873, 126598, 126928, 131734, 132002, 132524, 132553, 132875, 133433, 133610, 133709, 134018, and 134030. (Plaintiff's Ex. 2.) Payments on each of the Plaintiffs' invoices were due within ten days of the date of each invoice. The latest date on which payment was due on any of the Weis–Buy invoices was October 3, 1997. The latest

ment was entered against Ralph J. Paglia, Jr.

on September 11, 2000.

date on which payment was due on any of the Brigiotta invoices was March 4, 1998. Neither Weis–Buy nor Brigiotta received payment for the produce.

### United Fruit's Bankruptcy

United Fruit voluntarily filed a Petition Under Chapter 11 of the Bankruptcy Code on December 9, 1997. (Plaintiff's Ex. 3, *In Re United Fruit & Produce Co., Inc.,* Bankr.No. 97–11852, Memorandum, at 2–3) (Bankr C. W.D.Pa. Dec. 29, 1999.) United Fruit ceased operations in March, 1998. (*Id.* at 5.) Weis–Buy and Brigiotta's claims were determined to be qualified valid PACA claim by the Bankruptcy Court, and each received a partial distribution from United Fruit's remaining assets. (*Id.* at 19–20.)

### United Fruit and Mr. Scolio's Involvement

United Fruit was started in 1914, by Mr. Scolio's father. (Transcript of Proceedings, March 19, 2003, at 6, 36.) Mr. Scolio became involved with United Fruit in 1949, and by 1960 he was a partner in the business with his father. (*Id.*) After his father's death in 1965, Mr. Scolio was sole proprietor of United Fruit until 1986, when he sold the company to John Tarantino, Irvin Rovner, and Larry Altman, however, Mr. Scolio remained as an employee of United Fruit. (*Id.* at 6, 38–39.)

Ralph Paglia was brought in to manage the company in 1988. (*Id.* at 7.) By 1994, two of the partners, Tarantino and Altman, had sold their shares, and Mr. Scolio had purchased shares amounting to 25% of the business. (*Id.*) Mr. Paglia owned 50%, and Mr. Rover owned 25%. (*Id.*)

According to Mr. Scolio, Mr. Paglia could not afford to buy all the shares he wanted to, so Mr. Scolio agreed to purchase the 25% share until Mr. Paglia could afford to buy it. (*Id.* at 40–41.) However, Mr. Scolio never did sell his shares, and he retained his 25% share at the time United fruit filed for bankruptcy. (*Id.* at 5.)

While he was 25% owner, Mr. Scolio remained as an employee of United Fruit. His duties included directing payments for payroll and trucking company bills. (*Id.* at 7, 42.) Mr. Scolio's payroll duties included tallying up the employee's hours and multiplying times their hourly rate. (*Id.* at 42, 55–56.) He then would instruct United Fruit's payroll service as to what amount each employee would be paid. (*Id.*) The payroll company would produce the checks and deliver them to United Fruit. Mr. Scolio would verify the checks for accuracy, and then the checks were delivered to the employees. (*Id.*)

Both Mr. Scolio's and Mr. Paglia's signatures were required for disbursement of checks from United Fruit. (*Id.* at 8, 52) As an authorized signatory on United Fruit's bank accounts, Mr. Scolio had a signature stamp created to use on United Fruit's checks, and this stamp was in fact used to issue checks. (*Id.* at 7,8.)

By letter dated June 5, 1997, Mr. Paglia, with 50% ownership requested Mr. Scolio's retirement, effectively firing him as of June 8, 1997. (Plaintiff's Ex. 5; Transcript, at 10.) The letter ended with Mr. Paglia stating:

> Your directorship and participation in the corporation's Board of Directors is both expected and requested. I would never want to give up access to your advisory capabilities.

(Plaintiff's Ex. 5) Although he stopped working for United Fruit, Mr. Scolio retained his 25 % ownership share, he remained as a signatory on United fruit's bank accounts, he was still an officer, and he retained his title as a vice-president. (Transcript, at 11, 14.)

United Fruit continued to use Mr. Scolio's signature stamp to authorize checks after June 8, 1997. (*Id.* at 11–14, *see also* Plaintiff's Ex. 4, showing United Fruit's

checks issued to Plaintiffs after June 8, 1997.)

Mr. Scolio gave his personal guarantee in favor of Dollar Bank Leasing, and he may have also given a personal guarantee in favor of First Western Bank. (Transcript, at 18–19)

Mr. Paglia and Mary Louise Bell (an employee of United Fruit) had confirmed to representatives of Plaintiffs that Mr. Scolio's authorization was necessary before a check was released. (*Id.* at 22, 25, 29.) For certain checks issued to Weis–Buy, the Weis–Buy representative understood that United Fruit, through Mr. Scolio, had restricted when the checks should be deposited. (*Id.* at 30–31.)

## II. The Perishable Agricultural Commodities Act

Congress enacted the Perishable Agricultural Commodities Act ("PACA") in 1930 to regulate the sale of perishable agricultural commodities, largely fruits and vegetables. *Consumers Produce Co., Inc. v. Volante Wholesale Produce Inc.*, 16 F.3d 1374, 1377 (3d Cir.1994). Congress explained that PACA was enacted

> to encourage fair trading practices in the marketing of perishable commodities by suppressing unfair and fraudulent business practices in marketing of fresh and frozen fruits and vegetables . . . and providing for collecting damages from any buyer or seller who fails to live up to his contractual obligations.

*Endico Potatoes, Inc. v. CIT Group/Factoring, Inc.*, 67 F.3d 1063, 1067 (2d Cir.1995)(quoting H.R.Rep. No. 543, 98th Cong., 2d Sess. 3 (1983), *reprinted in* 1984 U.S.C.C.A.N. 405, 406).

■ Section 499e(c) of PACA "impresses a trust in favor of the sellers on the inventories of commodities, the products derived therefrom, and the proceeds of sale of such commodities and products." *Endico Potatoes*, 67 F.3d at 1068 (citing

H.R.Rep. No. 543, at 4, *reprinted in* 1984 U.S.C.C.A.N. at 407). "This provision imposes a 'non-segregated floating trust' on the commodities and their derivatives, and permits the commingling of trust assets without defeating the trust". *Id.* (quoting 7 C.F.R. § 46.46(c)) and citing *JSG Trading Corp. v. Tray–Wrap, Inc.*, 917 F.2d 75, 78 (2d Cir.1990). "Through this trust, the sellers of the commodities maintain a right to recover against the purchasers superior to all creditors, including secured creditors." *Id.* Likewise, "[u]nder this provision, commission merchants, dealers, and brokers are required to hold the goods received in a floating, non-segregated trust for the benefit of the unpaid supplier." *Bandwagon Brokerage, Inc. v. Mafolie Foods Co., Inc.*, 168 F.Supp.2d 506 (D.Vi. 2001) (citing *In re Magic Restaurants Inc.*, 205 F.3d 108, 111 (3d Cir.), *cert. denied*, 531 U.S. 818, 121 S.Ct. 56, 148 L.Ed.2d 24 (2000); *Consumers Produce*, 16 F.3d at 1378).

■ The PACA trust is imposed on the produce itself and receivables and proceeds generated therefrom. 7 U.S.C. § 499e(c)(2). In essence, this trust gives a supplier of perishable agricultural commodities covered by PACA a secured interest in the buyer's assets. *See* 7 U.S.C. § 499e(c)(1). Upon timely notice of the seller's intent to preserve the trust benefits, all produce-related assets are held in trust for the benefit of the unpaid seller until full payment has been received. *C.H. Robinson Co. v. Alanco Corp.*, 239 F.3d 483, 486 (2nd Cir.2001); *Sunkist Growers, Inc. v. Fisher*, 104 F.3d 280, 282 (9th Cir. 1997).

In addition to the liability of the corporate buyer, several courts have held that an individual who is in a position to control the PACA trust assets, but does not preserve them for the beneficiaries, has breached a fiduciary duty and is personally liable for that tortious act. *See, e.g., Gol-*

man–Hayden Co., Inc. v. Fresh Source Produce Inc., 217 F.3d 348, 351 (5th Cir. 2000); Hiller Cranberry Products, Inc. v. Koplovsky, 165 F.3d 1, 8–9 (1st Cir.1999); Sunkist Growers, Inc. v. Fisher, 104 F.3d 280, 283 (9th Cir.1997); Shepard v. K.B. Fruit & Vegetable, Inc., 868 F.Supp. 703, 706 (E.D.Pa.1994); Morris Okun, Inc. v. Harry Zimmerman, Inc., 814 F.Supp. 346, 348 (S.D.N.Y.1993).

■ As explained in Shepard, 868 F.Supp. at 706, "PACA liability attaches first to the licensed seller of perishable agricultural commodities. If the seller's assets are insufficient to satisfy liability, others may be found secondarily liable if they had some role in causing the corporate trustee to commit the breach of trust." Likewise in Morris Okun, 814 F.Supp. at 348, the court explained that an "individual who is in the position to control the trust assets and who does not preserve them for the beneficiaries has breached a fiduciary duty, and is personally liable for that tortious act." In addition that court explained that "a PACA trust in effect imposes liability on a trustee, whether a corporation or a controlling person of that corporation, who uses the trust assets for any purpose other than repayment of the supplier." Id. (emphasis added).

■ Personal liability under PACA requires only that trust assets be used for some purpose other than repayment to the seller. Morris Okun, Inc., 814 F.Supp. at 348 (cited in Hiller Cranberry Products, 165 F.3d at 9). "This includes use of the proceeds from the sale of perishables for legitimate business expenditures, such as the payment of rent, payroll, or utilities." Id.

## III. DISCUSSION

### A. Statute of Limitations

Mr. Scolio first argues that Plaintiffs' claims should be dismissed because they are time-barred.

PACA does not contain an express statute of limitations for bringing an action by a trust beneficiary to recover payment under PACA. In these circumstances, courts generally turn to the most analogous state statute of limitations. Mr. Scolio submits that the most closely analogous Pennsylvania statute of limitations is the two-year limitation on claims for breach of fiduciary duty. See 42 Pa.C.S.A. 5524(7). Mr. Scolio contends that Plaintiffs' cause of action accrued on the date that payments were due on the last invoices from each Plaintiff. For Weis–Buy that date is October 3, 1997, and for Brigiotta's that date is March 4, 1998. He concludes that since the Complaint was filed on April 26, 2000, over two years after the date Plaintiffs' causes of action accrued, the claims are therefore time-barred.

Plaintiffs disagree and instead contend that no statute of limitations applies since the nature of PACA trust violations are ongoing. Plaintiffs explain that the breach of fiduciary duty is ongoing until either the breach is remedied, or the trust no longer exists. Alternatively, Plaintiffs argue that any limitations period that would apply would be tolled as a result of Mr. Scolio's continuing breach of his duty.

In part, Plaintiff points to the unique nature of PACA and a PACA violation. One aspect of PACA is that the statute itself expressly requires the trust to be maintained until the violation is remedied. A suit under PACA by a supplier to collect unpaid funds is, in Plaintiffs' words, not a suit to collect an unpaid bill. Plaintiffs describe the PACA action as one to hold a PACA trustee accountable for an ongoing violation of the trustee's PACA obligations to pay the supplier from the maintained trust assets. Specifically, in this action Plaintiffs are not seeking payment for breach of contract (there is no contract between each Plaintiff and Mr. Scolio), nor

are they seeking to pierce the corporate veil to get to Mr. Scolio's assets—they are suing for a violation under PACA.

■ The express language of the statue states that a PACA trustee is to hold the trust assets for the benefit of PACA beneficiaries until those beneficiaries have been paid.

> (2) Perishable agricultural commodities received by a . . . dealer, . . . in all transactions, and all inventories of food or other products derived from perishable agricultural commodities, and any receivables or proceeds from the sale of such commodities or products, shall be held by such . . . dealer, . . . in trust for the benefit of all unpaid suppliers or sellers of such commodities . . ., *until full payment of the sums owing in connection with such transactions has been received by such unpaid suppliers [or] sellers . . . .*

7 U.S.C. § 499e(c)(2)(emphasis added). Thus, Plaintiffs are correct that the PACA trust remains in existence until the beneficiary is paid.

In addition, the regulations implementing PACA reinforce that the trust is to be maintained and remain in existence until the beneficiaries are paid. Section 46.46 of Title 7 of the Code of Federal Regulations explains as follows:

> (c) Trust benefits.
> (1) When a seller, . . . transfers ownership, possession, or control of goods to a . . . dealer, . . ., [the seller] automatically becomes eligible to participate in the trust. Participants who preserve their rights to benefits in accordance with paragraph (f) of this section *remain beneficiaries until they are paid in full.*

7 C.F.R. § 46.46(c)(1)(emphasis added). The regulations go on to explain trust maintenance as follows:

> (d) Trust Maintenance.
> (1) *Commission . . . dealers . . . are required to maintain trust assets in a manner that such assets are freely available to satisfy outstanding obligations to sellers of perishable agricultural commodities.* Any act or omission which is inconsistent with this responsibility, including dissipation of trust assets, is unlawful and in violation of Section 2 of the Act, (7 U.S.C. 499b).

7 C.F.R. § 46.46(c)(1)(emphasis added).

Mr. Scolio rejects Plaintiffs' reliance on the statutory and regulatory language regarding PACA trusts. He concludes that any "cause of action for breach of fiduciary duty which Plaintiffs may have had against Scolio would have accrued on the date payments became overdue." (*Scolio's Response,* at 5, ¶¶ 5 & 6.) Mr. Scolio explains that once the date the invoices were due passed,

> Plaintiffs clearly knew there had been a breach of contract by United Fruit, and hence knew they could sue United Fruit for breach of contract or bring a PACA claim for breach of trust. The specific breach of fiduciary duty which Plaintiffs allege against Scolio is that he failed to see to it that trust assets were used to pay Plaintiffs' Invoices. If there was such a breach, it occurred when the due dates for the invoices passed and Plaintiffs were not paid.

(*Scolio's Proposed Findings,* at 13; *see also Scolio's Response,* at 5, ¶ 7.)

Mr. Scolio does not dispute that the PACA trust remains in existence until the beneficiary is paid pursuant to section 499e(c)(2). But when viewing 499e(c)(2) as applied to him, Mr. Scolio argues that he himself "never received any produce, inventories, products, receivables or proceeds from any of the invoices at issue in this case[, and he] never held anything 'in trust' in this case because he never held anything." (*Scolio's Response,* at 7, ¶ 2.)

We can see no way to view Mr. Scolio's argument other than as an assertion that

section 499e(c)(2) does not apply to him, and thus the court need not rely on section 499e(c)(2) when analyzing the limitations question. He reiterates that this is a "garden variety" breach of fiduciary duty case filed beyond the limitations period and not subject to a continuing violations theory. (*Scolio's Proposed Findings,* at 14, citing *Tyler v. O'Neill,* 1998 WL 961383 (E.D.Pa. Dec.15, 1998), *affirmed,* 189 F.3d 465 (3d Cir.1999), *cert. denied,* 528 U.S. 1137, 120 S.Ct. 981, 145 L.Ed.2d 932 (2000).)

Mr. Scolio is correct that if he is not subject to suit under PACA, then it would make no sense to look to PACA's language to determine if the Plaintiffs' suit was timely. To the extent that Mr. Scolio argues that no "controlling person" can be personally liable under PACA, the case law is clear that such a person can be held liable. The question of whether Mr. Scolio himself is a controlling person liable under PACA, however, is the substantive question of law presented at trial. We cannot ignore the statutory and regulatory language of PACA.

 We now examine the questions of when the cause of action accrued, whether the limitations period was tolled, and whether this is a continuing violation. "Accrual marks the time at which the statute of limitations begins to run in the first instance. *See* Black's Law Dictionary 21 (6th ed.1990). Tolling, by contrast, halts the statute once it has already begun to run. *See id.* at 1488." *Board of Trustees v. D'Elia Erectors, Inc.,* 17 F.Supp.2d 511, 516 n. 8 (E.D.Va.1998), citing, *inter alia, Vernau v. Vic's Market, Inc.,* 896 F.2d 43 (3d Cir.1990). "A cause of action for a continuous injury accrues when the wrong terminates." *Tyler,* 1998 WL 961383, *6 n. 1 (citing *Stuebig v. Hammel,* 446 F.Supp. 31, 35 (M.D.Pa.1977)).

The *Tyler* court explained that generally, "a 'continuous injury' arises in occupational disease cases, in cases involving a

contract for continuous service which is silent as to duration, or such other analogous factual situation." *Tyler,* 1998 WL 961383, *6 n. 1 (citing *Fowkes v. Pennsylvania R.R. Co.,* 264 F.2d 397 (3d Cir.1959); *Plazak v. Allegheny Steel Co.,* 324 Pa. 422, 188 A. 130 (1936); *Wm. B. Tenny, Builder and Developer v. Dauphin Dep. Bank & Trust Co.,* 302 Pa.Super. 342, 448 A.2d 1073 (1982); and *Stuebig,* 446 F.Supp. 31).

In *Fowkes,* a continuous violation case involving a physical injury, the Court noted the "conceptual difficulty and the practical problem of applying a statute of limitations phrased in terms of the accrual date of a cause of action to this type of injury." *Fowkes,* 264 F.2d at 398. The Court then quoted an early Supreme Court FELA case that stated:

"We do not think it is possible to assign to the word 'accrued' any definite technical meaning which by itself would enable us to say whether the statutory period begins to run at one time or the other; but the uncertainty is removed when the word is interpreted in the light of the general purposes of the [FELA] statute and of its other provisions, and with due regard to those practical ends which are to be served by any limitation of the time within which an action must be brought."

*Fowkes,* 264 F.2d at 398–399 (quoting *Reading Co. v. Koons,* 271 U.S. 58, 61–62, 46 S.Ct. 405, 406, 70 L.Ed. 835, (1926)). Similarly, in this action it is not an easy task to pinpoint an accrual date for the claims asserted against Mr. Scolio. We find that that the claims here are continuing violations under PACA. Alternatively, we find that the claims would be timely even if they are not continuing violations.

We are not convinced that Plaintiffs' right to institute and maintain suit against Mr. Scolio occurred when the date due on the invoices passed. Once the date for

payment on the invoices passed, clearly United Fruit was in breach of contract. On those same dates, United Fruit violated PACA. The limitations period for the breach of contract began to run on those dates, and may or may not have been tolled. That issue is not before us. Likewise, whether the limitations period began to run for United Fruit's violation of PACA is not directly at issue this case, but does serve as the starting point for discussing when a cause of action may have accrued against Mr. Scolio.

■ Under PACA and the case law, a plaintiff first seeks the trust assets from the licensed seller, in this case United Fruit. If the seller has insufficient assets, then the plaintiff is able to seek recovery from controlling persons. *Shepard*, 868 F.Supp. at 706 ("PACA liability attaches first to the licensed seller of perishable agricultural commodities. If the seller's assets are insufficient to satisfy liability, others may be found secondarily liable if they had some role in causing the corporate trustee to commit the breach of trust.").

■ As noted, the Bankruptcy court authorized a partial distribution to Plaintiffs as PACA claimants from United Fruit's remaining assets in an opinion issued on December 29, 1999. (Plaintiff's Ex. 3, *In Re United Fruit & Produce Co., Inc.,* Bankr.No. 97–11852, at 19–20.) Thus, on December 29, 1999, Plaintiffs were on notice that United Fruits's assets were insufficient to satisfy liability.

Under these circumstances, it may be that the statute of limitations for bringing PACA claims against an alleged controlling person of United Fruit accrued and began to run on December 29, 1999. Because Plaintiffs' lawsuit was filed only four months later, the claims against Mr. Scolio would have been filed well within any limitations period.

■ Alternatively, if we assume that the PACA causes of action against Mr. Scolio accrued at the same time as United Fruit's violation of PACA (October 3, 1997 and March 4, 1998), then the limitations period for bringing PACA claims against Mr. Scolio would have been tolled while Plaintiffs first sought relief from United Fruit. Under this scenario, the tolling period would have ended on December 29, 1999, when Plaintiffs learned that United Fruit's assets were insufficient. Therefore, Plaintiffs claims would still have been timely filed when this action was filed on April 26, 2000.

■ The PACA statute and implementing regulations are clear. The PACA trust remains in existence until the beneficiary is paid. This is not a "garden variety" breach of fiduciary duty under the statutory and regulatory language of PACA, and the case law interpreting both. Congress intended that a violation of PACA or a breach of fiduciary duty under PACA is ongoing until either the breach is remedied, or the trust no longer exists. We conclude that there is no violation of the statute of limitations period here as the cause of action is ongoing and continuous.

Alternatively, we hold that this action is timely either because the claims were tolled until December 29, 1999, or because the claims did not accrue until December 29, 1999.

## B. Liability for Breach of Fiduciary Duty under PACA

■ Plaintiffs must establish that Mr. Scolio was in a position to control PACA trust assets, and that he breached his fiduciary duty to preserve those assets. We conclude that Plaintiffs have met their burden.

Mr. Scolio argues that he was no longer employed by United Fruit at the time the

produce was delivered or the invoices were issued. He also argues that his minimal involvement when he was employed with United Fruit did not encompass ordering products or disbursing corporate funds. He further contends that he did not make payments to himself or anyone else out of trust assets and he did nothing to dissipate trust assets. He also argues that he did not have the ability to control the operations of United Fruit or any trust assets. In support of this contention, he notes that he could not even control whether he continued to be employed. As to the signature stamp, Mr. Scolio submits that this was a *pro forma* exercise accomplished without seeking his approval. He contends that had he demanded that the stamp be returned, then United Fruit simply would have changed their account to eliminate the need for the use of the stamp.

He also relies on several cases to demonstrate that to be held liable as a "controlling person" under PACA, the person is typically a sole or controlling shareholder, a president, or some other primary actor, but that less involved individuals are typically not held personally liable. (*Scolio's Proposed Findings*, at 17–22) (citing *Ideal Sales, Inc. v. McGriff*, 1997 WL 148043 (N.D.Tex. Mar.26, 1997); *Heartland Produce Company v. Kazmer, Inc.*, 1996 WL 680014 (N.D.Ill. Nov.21, 1996); *Mid–Valley Produce Corp. v. 4–XXX Produce Corp.*, 819 F.Supp. 209 (E.D.N.Y. 1993); and *Farm–Wey Produce, Inc., v. Wayne L. Bowman Co., Inc.*, 973 F.Supp. 778 (E.D.Tenn.1997)). He argues that the facts of his case show that he is not liable.

With one exception, however, these cases still assign liability to persons who are in a position to control trust assets.

In *Mid–Valley Produce*, that Court did hold a corporate officer with check signing authority liable for payment of trusts assets to non-beneficiaries. 819 F.Supp. at

212. In doing so, the Court stated that the "use of PACA trust funds by 4–XXX for such items as salary and loan payments constitutes a dissipation of PACA trust funds and a breach of 4–XXX's fiduciary duties as trustee." *Id.* (citations omitted). The Court did not, however, find that a sole shareholder is *presumed* to exercise control, and thus refused to grant summary judgment in favor of plaintiff. *Id.* at 213. This is in accord with the case law under PACA that for liability to be found a plaintiff must establish that a person is in a position to control the trust assets and that he or she does not preserve them. This is not strict liability.

In *Heartland Produce*, a motion to dismiss was presented by a 15% shareholder seeking dismissal of a PACA claim for personal liability. *Id.* 1996 WL 680014. He alleged that he was never elected or appointed as a director, officer, or manager; he never ordered product from plaintiff; and he had no control over finances. *Id.* at *2. The Court declined to grant the motion citing the remedial nature of the PACA statute and that it must be interpreted broadly. *Id.* at *3 (citations omitted). Thus, the plaintiffs would be permitted an opportunity to produce facts that would show that the shareholder is personally liable. *Id.*

In *Ideal Sales*, the Court was considering Plaintiffs' motion for summary judgment against the 80% shareholder, Marcella McGriff, and the 20% shareholder, Ted Scribner. 1997 WL 148043. The Court found that the 80% shareholder could be found liable and explained that she

exercised sufficient control and responsibility of Sharp Farms so as to warrant holding her individually liable for breach of the PACA trust. McGriff was an eighty percent shareholder of Sharp Farms, she was president of Sharp Farms, and she signed Sharp Farms'

checks used to pay suppliers' invoices. She also admits that she held general responsibility to manage the finances of the company. 1997 WL 148043,*4. The Court also found that the evidence was insufficient to establish whether Scribner was a person in control, explaining that "[h]is duties were to buy and sell produce and maintain related records [and he] did not make any financial decisions and only rarely signed checks to suppliers." 1997 WL 148043, *5.

Five months later, Plaintiffs again sought summary judgment against Scribner. *Ideal Sales, Inc. v. McGriff,* 1997 WL 560779 (N.D.Tex. Sept.2, 1997) (*Ideal Sales II*). The Court denied the motion, deciding that Scribner was not personally liable for the breach of the PACA trust. 1997 WL 560779, *4. The Court found the evidence was insufficient to find that Scribner was a person in control noting that he had little dealing with accounts payable, his primary duties were to buy and sell produce, keep customer relations, and maintain related records, and that he alone did not make any financial decisions and only rarely signed checks to suppliers. 1997 WL 560779, *3.

While this case is most similar to Mr. Scolio's, there are factual differences between Scribner's involvement and Mr. Scolio's involvement. Mr. Scolio did not occasionally sign checks, he regularly signed checks as his signature was required to render the checks valid. To the extent that our decision can be seen as inconsistent with the decision in *Ideal Sales II* we decline to follow *Ideal Sales II*.

Finally, the Court in *Farm–Wey* discusses the numerous cases finding that a person in control can be held personally liable under PACA, but disagrees and holds otherwise. 973 F.Supp. at 781–784. The *Farm–Wey* Court concluded that had Congress intended to impose individual lia-

bility under PACA, it would have expressly said so. *Id.* at 783.

The view set forth in *Farm–Wey* contradicts recognized rules of statutory construction and neglects the recent chronology of case law and congressional action on PACA. In 1993, *Morris Okun* was decided in which the Court found individual personal liability under PACA. 814 F.Supp. 346. This decision was followed by other cases, for example, *Mid–Valley Produce,* 819 F.Supp. 209 in 1993; and *Shepard,* 868 F.Supp. 703 in 1994. In 1995, Congress amended PACA, yet did not amend the act to expressly state that individual liability under PACA was not to be imposed as the courts were then interpreting the law. The majority of courts addressing personal liability under PACA continue to find that controlling persons can be liable, contrary to the *Farm–Wey* decision. We follow the majority view on this issue and decline to follow *Farm–Wey.*

Mr. Scolio was at all relevant times a 25% owner and officer of United Fruit. He was an authorized signatory on United Fruit's bank accounts, and had a signature stamp created to use on United Fruit's checks. This stamp was in fact used to issue checks distributing funds constituting PACA trust assets to non-produce creditors.

At no time did Mr. Scolio object to the use of his signatory stamp, or direct that United Fruit cease from using his stamp. Mr. Scolio was in a position to control United Fruit's actions in a significant way—he could have stopped the use of his signatory stamp after he was fired as an employee but remained as a shareholder, director and vice-president. He also could have refused to offer his personal guarantee to United Fruit.

We find that Mr. Scolio was a controlling person in a position to control PACA trust assets, and that he breached his fidu-

ciary duty to preserve those assets. Accordingly, we conclude that Mr. Scolio is liable under PACA.

As the Fifth Circuit Court of Appeals aptly put it, "PACA is a 'tough law'" *Golman–Hayden,* 217 F.3d at 351 (citing *Hawkins v. Agricultural Marketing Service,* 10 F.3d 1125, 1130 (5th Cir.1993)(other citation omitted)). "An investor in a perishable commodities corporation 'should know at the beginning of his association with such a corporation that he is "buying into" a corporation which is strictly regulated by the federal government through PACA.'" *Golman–Hayden,* 217 F.3d at 351 (quoting *Hawkins,* 10 F.3d at 1131). Although it may be a harsh result, we believe it is 'consistent with the intent of Congress in establishing the statutory trust provisions of PACA." *Golman–Hayden,* 217 F.3d at 351.

## C. Interest and Attorney's Fees under PACA

▇▇▇ Plaintiffs also seek an award of interest and attorneys' fees. Plaintiffs' invoices include terms for an award of interest at 18 percent per year, and for attorney's fees for collection costs. (*See* Ex. 1 and 2.)

It is not disputed that the interest and fee provisions on Plaintiffs' invoices are properly terms of the contract between each Plaintiff and United Fruit. Mr. Scolio objects first, on the basis that PACA does not provide for an award of attorney's fees, and second, because there was no contract between each Plaintiff and Mr. Scolio individually.

The fact that Mr. Scolio is not a party to the contracts as an individual is not relevant as this is a case seeking recovery from a PACA trust. We agree with Plaintiffs that the plain language of the statute provides for collection of more than just the cost of the produce.

Plaintiffs are not seeking a *statutory* award of attorneys' fees, but are seeking enforcement of the terms of the contracts providing for interest and collection fees as "sums owing in connection with" the produce that was the subject of the invoices and this suit to collect on those invoices. 7 U.S.C. § 499e(c)(2). Under section (c)(2), the PACA trust is to be held for the benefit of an unpaid supplier or seller "until full payment of the sums owing in connection with such transactions has been received by such unpaid suppliers [or] sellers . . . ." 7 U.S.C. § 499e(c)(2).

The district courts that have considered this issue have all allowed the recovery of interest and fees under PACA concluding that they are sums "in connection with" the transactions. *See, e.g., E. Armata, Inc. v. Platinum Funding Corp.,* 887 F.Supp. 590, 594–595 (S.D.N.Y.1995); *Morris Okun,* 814 F.Supp. at 351.

In addition the Circuit Courts of Appeal that have addressed this issue agree. The United States Court of Appeals for the Ninth Circuit was the first circuit court to examine whether an unpaid seller could recover fees and costs under PACA, and it stated:

> The plain meaning of the PACA statute's words *"in connection with"* encompasses not only the price of the perishable agricultural commodities but also additional related expenses, including contractual rights to attorneys' fees and interest, in a PACA claim.

*Middle Mountain Land and Produce, Inc. v. Sound Commodities, Inc.,* 307 F.3d 1220, 1222–1223 (9th Cir.2002).

On March 1, 2004, the United States Court of Appeals for the Eleventh Circuit followed the Ninth Circuit and held "that attorney fee and interest provisions can be enforceable as additional contract terms under the Uniform Commercial Code", and that such fees and interest can be awarded

as "sums owing in connection with" perishable commodities transactions under the PACA statute. *Country Best v. Christopher Ranch, LLC,*361 F.3d 629, 630 (11th Cir. Mar.1, 2004). In *Country Best,* the Court stated

> Had Congress intended to limit PACA claims solely to the price of the commodities, it could have inserted language reflecting that limitation in 7 U.S.C. § 499e(c)(2). Instead, it chose to allow *"full payment of the sums owing in connection with [commodities] transactions."* This unambiguously encompasses not only the price of commodities but also additional related expenses. Such related expenses include attorney fees and interest that buyers and sellers have bargained for in their contracts.

*Country Best,* 361 F.3d at 632 (citing *Middle Mountain,* 307 F.3d at 1223).

■■■ We agree and adopt the well-reasoned opinions set forth above. Thus, we hold that contractually bargained for attorney fee and interest provisions can be awarded as "sums owing in connection with" perishable commodities transactions under the PACA statute. *Middle Mountain,* 307 F.3d at 1222–1223; *Country Best,* 361 F.3d at 632.

As noted it is not contested that the parties' contracts include provisions for attorney fees and interest, and we so find. Accordingly, we hold that Plaintiffs are entitled to recover their contractually bargained for interest and attorneys' fees as sums owing in connection with the relevant produce transactions.

## IV. *Conclusion*

The claims in this action are not barred by the statute of limitations. Defendant is found liable under the Perishable Agricultural Commodities Act, and Plaintiffs are entitled to an award of interest and attorneys' fees. Judgment will be entered in favor of Plaintiffs, and against Defendant.

An appropriate Order follows.

## ORDER

AND NOW, to-wit, this 9th day of March, 2004, for the reasons set forth in the Opinion accompanying this Order, it is hereby ORDERED, ADJUDGED, and DECREED as follows:

1. Judgment is entered in favor of Plaintiff Weis–Buy Services, Inc., and against Defendant August J. Scolio, Jr, in the amount of $35,945.90, plus interest and attorney's fees.

2. Judgment is entered in favor of Plaintiff Brigiotta's Produce & Garden Center, and against Defendant August J. Scolio, Jr., in the amount of $17,088.95, plus interest and attorney's fees.